**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| TERRANCE JUSTICE, ANDREA HATFIELD, DEBBIE FINN, KAREN DOTSON, MICHAEL YOUNG, STEVEN and NANCY ROSS, CHAS SUMMERS, and KELVIN WISE, on behalf of Themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>RHEEM MANUFACTURING COMPANY,<br><br>Defendant. | CASE NO.: 14-80017-Civ-RNS<br><br>JURY TRIAL DEMANDED |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Terrance Justice, Andrea Hatfield, Debbie Finn, Karen Dotson, Michael Young, Steven and Nancy Ross, Chas Summers and Kelvin Wise ("Plaintiffs"), individually on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Rheem Manufacturing Company, ("Defendant" or "Rheem") and in support allege as follows:

## NATURE OF THIS ACTION

1. Rheem is a large manufacturer of heating, ventilation, and air conditioning products for residential use in the United States. Defendant manufactures and sells consumer central air conditioning units under its own trade name and under the Ruud trade name (hereinafter the "Rheem ACs").

2. Air conditioners, including Rheem ACs, contain a component known as an evaporator coil, which is an essential component to the system. Inside the evaporator coil, refrigerant (such as Freon, Puron, etc.) absorbs heat from the air passing over a tube and acts as a heat exchange, thereby cooling the home's air.

3. This diagram depicts a standard AC unit setup:




http://www.howstuffworks.com/how-to-maintain-an-air-conditioner.htm

4. Air conditioner manufacturers such as Rheem have traditionally manufactured evaporator coils using copper tubing. However, copper coils are uniquely vulnerable to a type of degradation known as "formicary corrosion." Exhibit 1.

5. The Air Conditioning Contractors of America ("ACCA") defines formicary corrosion as: "It is corrosion that occurs in copper based alloys. Due primarily to appearance, and the fact it appears like any nests in the copper under magnification it is often referred to as ants nest corrosion…A second nickname for formicary corrosion is pinhole corrosion due to the small size of the actual holes in the copper." *See What Causes Formicary Corrosion & How Is It Stopped?* (2010) ACCA Consumer Education Series, www.americancoolingandheating.com/wp-content/uploads/2012/01/What-Causes-Formicary-Corrosion.pdf.

6. Formicary corrosion is caused by a chemical reaction between molecules known as volatile organic compounds and the copper tubes, and results in microscopic tunnels within the tubing which causes the coil to leak refrigerant. Id.

7. Volatile organic compounds are a large group of carbon-based chemicals that are

given off from a host of common household products and activities. For example, volatile organic compounds are given off by composite wood furniture and flooring, carpeting, cleaning and disinfecting products, air fresheners, cosmetics, and numerous other consumer products. Id.

8. Formicary corrosion is a particularly insidious defect in an evaporator coil because the resultant leakage is difficult to detect, and usually results in consumers being forced to repeatedly refill their air conditioners with refrigerant, often at significant cost, which only works to mask the defect for a period of time, until the Coil fails.

9. Air conditioner manufacturers have begun to recognize copper coils' unique vulnerability to formicary corrosion as changes in housing and consumer behavior made formicary corrosion more prevalent and recognizable. Exhibit 2. For example, modern houses are typically made more energy efficient by improved sealing of windows and doors, which results in less heated/cooled air escaping the home. A natural and foreseeable result of this increase in energy efficiency is that volatile organic compounds tend to accumulate in the home's air.

10. A number of HVAC contractors have publicly expressed concern over the increasing incidence of formicary corrosion in air conditioning units. Exhibit 3.

11. There are reasonable design and manufacturing techniques available to air conditioner manufacturers to lessen or even prevent incidence of formicary corrosion. For example, evaporator coils can be manufactured from aluminum, which is not susceptible to formicary corrosion, or copper coils can be coated with a polymer sealant or tin plating. Other air conditioner manufacturers utilize these types of techniques and as a result have virtually eliminated the incidence of formicary corrosion in their air conditioners. Exhibit 4.

12. Despite being aware of the susceptibility of copper coils to formicary corrosion,

the increasing incidence of formicary corrosion, and the available remedies at its disposal, Rheem continued to design and manufacture its ACs using copper evaporator coils (referred to herein as "Rheem Coils" or "Coils"), and fix failed Coils with similarly defective Coils. Until recently, Rheem failed to take any of the known steps that are available to reduce the susceptibility of the copper in the Rheem Coils to formicary corrosion.

13. Rheem Coils are defective because they are manufactured with materials that, within the industry, are well known to be prone to formicary corrosion, which makes the Rheem Coils unreasonably susceptible to premature rupture and refrigerant leaks under normal use and conditions.

14. Because Rheem's copper evaporator coils leak refrigerant, the AC units are unable to function properly and are thus unfit for their ordinary and intended use. The loss of refrigerant due to leakage reduces and ultimately eliminates the ability of the AC unit to provide cold air and work as represented by Rheem.

15. On information and belief, Rheem began in the fall of 2013 to sell replacement coils manufactured from aluminum. This act demonstrates that Rheem had actual knowledge of the problems alleged herein in by at least September 2013 when Rheem established a program to sell replacement evaporator coils made with a different metal.

16. Rheem has not informed its customers of the Rheem ACs susceptibility to formicary corrosion, nor of the current availability of replacement coils which are not susceptible to formicary corrosion. Rheem knew, or reasonably should have known, that the Coils in its air conditioners were unreasonably susceptible to formicary corrosion and thus defective, but has failed or refused to inform consumers or initiate other similar action.

17. Rheem has not informed its customers of the causes of formicary corrosion, even

when replacing failed Coils, which would allow customers to make an informed decision about their risks.

18. Even if Rheem replaced the defective coil in a Rheem AC within the warranty period, the replacement coil was equally susceptible to formicary corrosion and likely to prematurely rupture and leak refrigerant under normal use.

19. When a defective coil leaks to the point that it eliminates the Rheem AC's ability to provide cold air within the warranty period, Rheem's standard practice is to replace the refrigerant in the unit, not the defective coil. Such a remedy, however, is only temporary and stop-gap in nature, and does not address the inherent defect in the Rheem AC. Once a consumer's warranty is expired, they are left with a defective product that requires a new evaporator coil, but no remedy offered by Rheem.

20. As Rheem has known of the Rheem ACs' defects and has failed to timely honor its express and implied warranties, the warranty has failed of its essential purpose, and the limitations therein are null and void. Further, the limitations contained in the limited warranty are not conspicuous.

21. Despite knowing of the defects in the Rheem ACs, Rheem has not notified all purchasers, builders, and/or homeowners with the Rheem ACs of the defect nor provided uniform relief.

22. Plaintiffs and Class Members have not received the value for which they or their builder bargained when the Rheem ACs were purchased. There is a difference in value between the Rheem ACs as warranted and the Rheem ACs containing the defect.

## THE PARTIES

23. Plaintiff Justice at all relevant times hereto has been a resident of Lake Worth, Florida. Plaintiff Justice owns a Rheem AC which had a Coil that failed, which he paid to replace.

24. Plaintiff Hatfield at all relevant times hereto has been a resident of Huntsville, Alabama. Plaintiff Hatfield owns a Rheem AC which had a Coil that failed, which she paid to replace.

25. Plaintiff Finn at all relevant times hereto has been a resident of Ohio. Plaintiff Finn owns a Rheem AC in her home in Hilton Head, South Carolina, which had a Coil that failed, which she paid to replace.

26. Plaintiff Dotson at all relevant times hereto has been a resident of Shady Vale, Georgia. Plaintiff Dotson owns a Rheem AC which had a Coil that failed, which she paid to replace.

27. Plaintiff Young at all relevant times hereto has been a resident of Silver Springs, Florida. Plaintiff Young owns a Rheem AC which had a Coil that failed, which he paid to replace.

28. Plaintiffs Ross at all relevant times hereto have been residents of Boca Raton, Florida. Plaintiffs Ross own a Rheem AC which had a Coil that failed, which they will pay to replace on September 27, 2014.

29. Plaintiff Summers at all relevant times hereto has been a resident of Orange County, Florida. Plaintiff Summers owns a Rheem AC which had a Coil that failed, which he paid to replace.

30. Plaintiff Wise at all relevant times hereto has been a resident of Jupiter, Florida. Plaintiff Wise owns a Rheem AC which had a Coil that failed, which he paid to replace.

31. Defendant Rheem Manufacturing Company is a Delaware corporation with its corporate headquarters located at 110 Abernathy Road, N.E., Suite 1400, Atlanta, Georgia.

## JURISDICTION AND VENUE

32. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs and at least one Class member is a citizen of a state different from Defendant.

33. Rheem transacts business in Florida, advertises and markets its products in Florida, disseminates the afore-described representations and deceptions throughout Florida, and derives substantial income from the sale of products in Florida.

34. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial part of the events, omissions and acts giving rise to the claims herein occurred in this District. Additionally, venue is appropriate for the claims arising out of Florida's Consumer Fraud Act because the statute applies to any company engaging in any of the activities regulated by the Act within the State of Florida.

## CLASS ALLEGATIONS

35. Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4) on behalf of the following nationwide consumer classes (the "Classes"):

> All persons residing in the United States who purchased a Rheem AC containing a Rheem Coil, primarily for personal, family, or household purposes.
>
> All persons residing in the United States who purchased a Rheem AC containing a Rheem Coil, primarily for personal, family, or household purposes, and who paid to replace a Rheem AC evaporator coil.

36. Plaintiffs Justice, Young, the Rosses, Summers and Wise also seek to represent subclasses defined as all members of the Classes who reside in Florida ("the Florida Subclasses").

37. Plaintiff Hatfield also seeks to represent subclasses defined as all members of the Classes who reside in Alabama ("the Alabama Subclasses").

38. Plaintiff Finn also seeks to represent subclasses defined as all members of the Class who reside in South Carolina ("the South Carolina Subclasses").

39. Plaintiff Dotson also seeks to represent subclasses defined as all members of the Class who reside in Georgia ("the Georgia Subclasses") (collectively, with the above states, the "Subclasses").

40. Subject to additional information obtained through further investigation and discovery, the foregoing Classes may be expanded or narrowed by amendment or amended complaint. Specifically excluded from the Classes is any entity in which Defendant had a controlling interest or which has a controlling interest in Defendant, and Defendant's legal representatives, assigns, and successors.

41. Members of the Classes are so numerous that joinder is impracticable. While the exact number of Class members is unknown to Plaintiffs, it is believed that the Class is comprised of thousands of members geographically disbursed throughout the United States and that the Subclasses is comprised of at least hundreds of members geographically disbursed throughout the respective states. The Class and Subclasses, however, are readily identifiable from information and records in the possession of Rheem.

42. Common questions of law and fact exist as to all members of the Classes. The critical questions of law and fact common to the Classes that will materially advance the

litigation are whether the Coils in Rheem ACs are inherently defective, whether they are not of a good and merchantable quality and/or do not perform according to the reasonable expectations of consumers and whether Rheem deceived consumers under the common law and statutory consumer protection laws identified in the pleadings. The resolution of these common questions of law and fact will, in turn, drive the resolution of the litigation.

43. Additional common legal and factual questions that will also drive the resolution of the litigation include, but are not limited to:

a) Whether Rheem ACs are defectively designed or manufactured;

b) Whether Rheem Coils (*i.e.*, made of copper) are defectively designed and/or manufactured;

c) Whether Rheem knew or reasonably should have known about the defects prior to distributing them to Plaintiffs and Classes;

d) Whether Rheem concealed from or failed to disclose to Plaintiffs and Classes the defect;

e) Whether Rheem breached express warranties relating to Rheem ACs;

f) Whether Rheem breached the implied warranty of merchantability under applicable state law;

g) Whether Rheem breached the implied warranty of fitness under applicable state law for a particular purpose;

h) Whether the terms of Rheem's written warranties relating to Rheem ACs were unconscionable or failed their essential purpose;

i) Whether Rheem was unjustly enriched by receiving monies in exchange for air conditioners that were defective;

j) Whether Rheem should be ordered to disgorge all or part of the ill-gotten profits it received from the sale of defective Rheem ACs and Coils, including replacement Coils;

k) Whether Plaintiffs and Classes are entitled to damages, including compensatory, exemplary, and statutory damages; and

l) Whether Rheem should be enjoined from selling and marketing the defective Rheem ACs.

44. Plaintiffs' claims are typical of the members of the Classes as all such claims arise out of Rheem's conduct in designing, manufacturing, warranting, marketing and selling the defective Rheem ACs and Rheem's conduct in concealing the defect in Rheem Coils from Plaintiffs and Classes.

45. Plaintiffs will fairly and adequately protect the interests of the Classes because Plaintiffs have no interests antagonistic to, or in conflict with, the Classes that Plaintiffs seeks to represent. Furthermore, Plaintiffs have retained counsel experienced and competent in the prosecution of complex class action litigation including but not limited to consumer class actions involving, *inter alia*, breach of warranties, product liability and design defects.

46. The class action mechanism is superior to other available means for the fair and efficient adjudication of the claims of all Class members. Besides the predominance of questions common to all Class members, individual Class members lack resources to undertake the burden and expense of individual prosecution of these claims against a large corporate defendant like Rheem, especially in comparison with the maximum individual recovery to which each Class member would be entitled. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. It also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Rheem's liability.

## <u>FACTS SPECIFIC TO PLAINTIFFS</u>

47. Plaintiffs were not told, nor did Rheem disclose, that Rheem ACs contained Rheem Coils that were defective, because they were unreasonably susceptible to formicary corrosion and failure, which would cause the air conditioning units to cease cooling or leak.

48. Plaintiffs did not and could not reasonably have discovered the defects at the time of purchase or delivery, nor known of the omitted material information regarding the defective coil in the Rheem ACs.

49. As a matter of practice, when a Coil fails due to formicary corrosion, Rheem requires its authorized dealers/service technicians to obtain the failed Coil from the AC owner and return it to Rheem as part of its warranty protocol; otherwise Rheem will not credit the dealer/technician for the work done. In this way, Rheem maintains exclusive control over all evidence relating to the (defective) failed Coils, failure rates and in particular root cause analysis of copper Coil failures

50. Plaintiffs purchased Rheem ACs rather than other available AC products. Had Plaintiffs known that Rheem ACs contained defective Coils; Plaintiffs would not have purchased Rheem ACs.

**<u>Justice</u>**

51. In May 2009, Plaintiff Justice purchased a Rheem AC from All Year Cooling in Fort Lauderdale, Florida.

52. Plaintiff Justice was not told, nor did Rheem disclose, that Rheem ACs contained Rheem Coils that were defective, because they were unreasonably susceptible to formicary corrosion and failure, which would cause the air conditioning units to cease cooling or leak.

53. In May 2009, the air conditioner was installed in Plaintiff Justice's home, and at that time he was given for the first time a document titled "Limited Warranty – Parts" (the

"Rheem Warranty"). Exhibit 5.

54. In February, 2012, Plaintiff Justice's Rheem AC ceased cooling. A service technician from Taylor Made AC replaced the refrigerant at a cost of $233, but did not diagnose the problem.

55. In February 2012, Plaintiff Justice's Rheem AC again ceased cooling. A technician from Taylor Made AC diagnosed the problem as a leaking coil and replaced the Rheem Coil at a cost of $360.

56. In September 2013, Plaintiff Justice's Rheem AC again ceased cooling. A technician from All About AC diagnosed the problem as a leaking coil and replaced the Rheem Coil at a cost of $450.

**Hatfield**

57. In July 2010, Plaintiff Hatfield purchased a Rheem AC from Beyer H.V.A.C. in Hazel Green, Alabama.

58. Plaintiff Hatfield was not told, nor did Rheem disclose, that Rheem ACs contained Rheem Coils that were defective, because they were unreasonably susceptible to formicary corrosion and failure, which would cause the air conditioning units to cease cooling or leak.

59. In July 2010, the air conditioner was installed in Plaintiff Hatfield's home, and at that time she was given for the first time a document titled "Limited Warranty – Parts" (the "Rheem Warranty"). Exhibit 6.

60. In July 2011, Plaintiff Hatfield's Rheem AC ceased cooling. A service technician from White's Refrigeration serviced the Rheem AC and found numerous problems, including a leaking coil.

61. In November 2011, White's Refrigeration refilled Plaintiff Hatfield's unit with refrigerant, at a cost of $294.

62. White's Refrigeration contacted Rheem and coordinated a replacement Rheem AC and coil, which was installed in March 2012 at a cost of $850.

63. In March 2012, the replacement Rheem AC and coil was installed in Plaintiff Hatfield's home, and at that time she was given for the first time a document titled "Limited Warranty – Parts" (the "Rheem Warranty"). Exhibit 7.

64. In September 2013, Plaintiff Hatfield's Rheem AC again ceased cooling. A technician from Garrison & Garrison, Inc. diagnosed the problem as a leaking coil and estimated its replacement cost at $850.00.

**Finn**

65. In October 2010, Plaintiff Finn purchased two Ruud Ultra Series model Rheem ACs from Preferred Aire, Inc. in Hilton Head Island, South Carolina.

66. Plaintiff Finn was not told, nor did Rheem disclose, that Rheem ACs contained Rheem Coils that were defective, because they were unreasonably susceptible to formicary corrosion and failure, which would cause the air conditioning units to cease cooling or leak.

67. In November, 2010, the air conditioner was installed in Plaintiff Finn's home.

68. Plaintiff Finn was not given a copy of the Limited Warranty at the time of purchase.

69. In May 2013, Plaintiff Finn's Rheem AC ceased cooling. A service technician from Preferred Aire, Inc. replaced the refrigerant and several days later replaced the coil at a cost of $1,414.

70. Plaintiff Finn was not given a copy of the Limited Warranty at the time the coil

was replaced.

**Dotson**

71. In 2007, Plaintiff Dotson purchased two Rheem ACs to be installed in her home under construction.

72. Plaintiff Dotson was not told, nor did Rheem disclose, that Rheem ACs contained Rheem Coils that were defective, because they were unreasonably susceptible to formicary corrosion and failure, which would cause the air conditioning units to cease cooling or leak.

73. Plaintiff Dotson was not given a copy of the Limited Warranty at the time of purchase.

74. Plaintiff Dotson moved into her new home in June 2008. At some point in 2009 one of the Rheem ACs ceased cooling and its Rheem Coil was replaced on June 24, 2009.

75. Plaintiff Dotson was not given a copy of the Limited Warranty at the time the coil was replaced.

76. In May 2013, Plaintiff Dotson's Rheem AC with the replacement coil ceased cooling. A service technician from D&W Airflow diagnosed the problem as a leaking coil at a cost of $326.30.

77. Plaintiff Dotson contacted Rheem in November of 2013, and was informed that Rheem will not cover the cost of labor or installation for the new coil, which is estimated to be between $750 and $800.

**Young**

78. On May 3, 2010, Plaintiff Young purchased a Rheem AC from Mobile Home Elec. & Air Inc. to be installed in his home.

79. Plaintiff Young was not told, nor did Rheem disclose, that Rheem ACs contained

Rheem Coils that were defective, because they were unreasonably susceptible to formicary corrosion and failure, which would cause the air conditioning units to cease cooling or leak.

80. Plaintiff Young was not given a copy of the Limited Warranty at the time of purchase.

81. Around September 2011, the Rheem AC ceased cooling and its Rheem Coil was replaced in September 2011 with another copper coil.

82. Plaintiff Young was not given a copy of the Limited Warranty at the time the coil was replaced.

83. Around August 2013, the Rheem AC again ceased cooling and its Rheem Coil was replaced towards the end of August 2013 with a tin-plated coil. Plaintiff Young paid $174.90 for refrigerant replacement to Hometown Air & Electric.

**Ross**

84. In September 2010, Plaintiffs Ross purchased a Rheem AC from Aspen Air to be installed in their home.

85. Plaintiffs Ross were not told, nor did Rheem disclose, that Rheem ACs contained Rheem Coils that were defective, because they were unreasonably susceptible to formicary corrosion and failure, which would cause the air conditioning units to cease cooling or leak.

86. Plaintiffs Ross was not given a copy of the Limited Warranty at the time of purchase.

87. Around September 2011, the Rheem AC ceased cooling and its Rheem Coil was replaced in September 2011.

88. Plaintiff Dotson was not given a copy of the Limited Warranty at the time the coil was replaced.

89. In July 2014, Plaintiffs Ross's Rheem AC with the replacement coil ceased cooling. A service technician diagnosed the problem as a leaking coil at a cost of $687 for labor. The service technician contacted Rheem who reduced the cost of labor to $387. A new aluminum coil is to be installed on September 27, 2014.

**Summers**

90. In November 2010, Plaintiff Summers purchased a Rheem AC to be installed in his home.

91. Plaintiff Summers was not told, nor did Rheem disclose, that Rheem ACs contained Rheem Coils that were defective, because they were unreasonably susceptible to formicary corrosion and failure, which would cause the air conditioning units to cease cooling or leak.

92. Plaintiff Summers was not given a copy of the Limited Warranty at the time of purchase.

93. In early 2011, the Rheem AC ceased cooling and its Rheem Coil was replaced. Plaintiff Summers paid for the cost of replacement refrigerant.

94. Plaintiff Summers was not given a copy of the Limited Warranty at the time the coil was replaced.

95. In August 2012, Plaintiff Summers's Rheem AC with the replacement coil ceased cooling. The coil was replaced again and Plaintiff Summers paid approximately $1200 for labor.

96. In October 2013, Plaintiff Summers's Rheem AC with the second replacement coil ceased cooling. Instead of paying for another replacement coil, Plaintiff Summers purchased a new Trane AC unit.

**Wise**

97. In February 2012, Plaintiff Wise purchased a Rheem AC from All Year Cooling to be installed in his home. The unit was installed in March 2012.

98. Plaintiff Wise was not told, nor did Rheem disclose, that Rheem ACs contained Rheem Coils that were defective, because they were unreasonably susceptible to formicary corrosion and failure, which would cause the air conditioning units to cease cooling or leak.

99. Plaintiff Wise was not given a copy of the Limited Warranty at the time of purchase.

100. In November 2013, the Rheem AC ceased cooling and a service technician from All Year Cooling diagnosed the problem as a leaking evaporator coil. The Rheem Coil was replaced on November 7, 2013. Plaintiff Wise paid $450 for this work.

## FACTS COMMON TO THE CLASS/CLAIMS

101. Upon information and belief, Defendant has sold, directly or indirectly (through dealers and other retailer outlets), thousands of Rheem ACs containing copper-made Coils nationwide and in the respective Subclass states, to homeowners, developers, contractors, or subcontractors.

102. Upon information and belief, Rheem designed, manufactured, marketed, advertised, warranted and sold, through a distributor, the Rheem ACs to Plaintiffs and Classes and their builders, contractors, subcontractors, or agents. Rheem ACs were installed on Class members' structures.

103. The Rheem Air Conditioners require refrigerant to perform their cooling function.

104. Rheem Coils are defective because they are unreasonably susceptible to formicary corrosion and break prematurely during normal use, resulting in the failure to prevent the leakage of the vital refrigerant.

105. This leaking of refrigerant is due to an inherent defect in the Rheem Air Conditioners' evaporator coils that occurs during normal and intended use and is not the result of any problem with installation or use of the units.

106. The defect renders the Rheem Air Conditioners unfit for their ordinary purpose because the loss of refrigerant reduces and ultimately eliminates the functionality of the Rheem Air Conditioners which are no longer able to produce cooled air.

107. Rheem expressly and impliedly warranted, via its user manuals, websites, brochures, specifications, or models that Rheem ACs are fit for the ordinary purpose in which such goods are used.

108. On its website, Rheem represented and warranted that:

> We simply offer the finest air conditioning solutions in the business. Top-quality, innovative products with the latest technology, dependable performance, great warranties and excellent service and support. All of this is why we confidently say, "Relax, It's Rheem."[1]

109. Rheem continues to make false representations about the quality and fitness of the Rheem Air Conditioners including, but not limited to:

> Respected For Reliability, Rheem is an industry leader for total heating, cooling and water heating solutions
>
> ***
>
> All Rheem products meet or exceed rigorous industry and regulatory standards for quality, reliability, efficiency, and air & water quality. From design and fabrication to finished product assembly, each phase in the manufacturing process is rigorously monitored and measured to ensure the highest quality, durability and operating excellence. Rheem products are routinely tested and certified by various government and third-party testing labs to ensure quality standards.
>
> ***
>
> Rheem Quality Complete factory run testing ensures your Rheem equipment operates at peak performance before being installed in your home.
>
> ***

[1] http://www.rheem.com/products/heating_and_cooling/air_conditioners/ (last visited November 6, 2013)

> Guaranteed Reliability Quality construction ensures quiet operation, better protection against the elements and long-lasting performance… Enjoy Long-Lasting Quality and Comfort. We understand that purchasing heating and cooling equipment is an investment. With Rheem, it's one you can expect to continually perform and deliver value for your family long-term.

110. The bargaining power between Plaintiffs and Class members and Subclass members on the one hand and Rheem on the other hand was grossly unequal and any limitations on the warranty are substantially one-sided, making such limitations unconscionable.

111. Contrary to its representations, the Rheem ACs are not of a merchantable quality, not fit for their intended use, and are defective.

112. The representations made by Rheem were false or misleading and Rheem knew or should have known at the time they made them that they were false or misleading.

113. All air conditioners use refrigerant in a closed-loop system designed to take advantage of a physical law known as phase conversion to provide cool air. When liquid is converted into gas, the process results in the absorption of heat. Refrigerants are substances that change phase at relatively low temperatures.

114. All air conditioners contain the following three major components: a compressor, a condenser, and an evaporator. In central air conditioners used for household purposes, the compressor and the condenser are located outside a consumer's house. The compressor compresses the refrigerant into high pressure gas which then travels to the condenser where it is cooled into high pressure liquid.

115. The evaporator for central air conditioners is usually located within the consumer's house and includes of a series of coils known as "evaporator coils." The liquid refrigerant is fed into the evaporator coils where it experiences a pressure drop that results in the refrigerant converting from liquid to gas. This phase conversion absorbs heat from the hot

indoor air circulated over the evaporator coils by a fan, which cools the air. The cool air is then blown through the house via ducts.

116. Like all central air conditioners used for residential purposes, the Rheem ACs at issue contain evaporator coils. However, Rheem evaporator coils render the Rheem ACs unfit for their ordinary purpose because they are unreasonably susceptible to formicary corrosion, resulting in the loss of refrigerant due to leakage, which reduces and ultimately eliminates the Rheem ACs' ability to provide cold air.

117. The problem of formicary corrosion has long been known to those in the industry. According to a 2001 NACE International, The Worldwide Corrosion Authority study, *see* Elliot, P. & Corbet, Richard, *Ant Nest Corrosion – Exploring the Labyrinth*, Corrosion/99, paper no. 342 (Houston, Texas: NACE 1999) (2001):

> Ant-nest corrosion, sometimes referred to as formicary corrosion, describes a particular form of localized corrosion found in copper tubes used for refrigeration and air conditioning applications. The nature of the attack is of a submicroscopic nature; pits created by this type of corrosion are so fine that they are not visible to the unaided eye.

118. According to a 2002 NACE International, The Worldwide Corrosion Authority study, *see Ant-Corrosion – Digging the Tunnels*, Corrosion/00, paper no. 646 (Houston, Texas: NACE 2000) (2002):

> This is the continuing saga into a very insidious form of corrosion apparently limited to refrigeration grade copper (i.e., DHP copper, UNS C12200) although other forms of attack, similar in appearance, have been observed in other alloys. This very localized attack is known as "ant-nest corrosion" (a.k.a. formicary corrosion). A previous review of this phenomenon (6) describes the mechanism where the copper base-metal oxidizes to form copper oxides and copper carboxylates (primarily copper formate).

119. In a 2005 article (Peter Elliot and Materials Consultancy, *Fight Formicary Corrosion*, Nov. 2005, Chemical Processing), researchers stated:

> Formicary, or ant's nest, corrosion is a little known phenomenon except to those who have experienced it first hand. It may best be described as micro-pitting in that the surface pits generally are so fine that they cannot be seen by the unaided eye. The first realization of a problem usually comes too late – in the form of a leaking tube.…
>
> More instances of formicary corrosion have been recorded during the past ten years that ever before.
>
> This type of corrosion most commonly appears in copper tubing in air conditioning and refrigeration equipment...

120. In 2007, Bryant Heating and Cooling Systems published a report on formicary corrosion. *See* Bryant, *Indoor Coil Corrosion, Industry Report – Identifying Common Sources*, 2007 ("Bryant Report"), which stated, in part, that:

> This issue exists industry-wide. A competitive study has shown identical corrosion failure leaks. In all coil brands investigated…The progression of the corrosion is from the exterior of the tube inward, eating away at the copper, until penetration occurs and a leak results.

121. According to a report by Carrier, which reviewed coil corrosion in numerous air conditioner units made by manufacturers including Rheem:

> Formicary corrosion affects coils industry-wide. A competitive study has shown identical corrosion failure leaks in all coil brands investigated…the progression of the corrosion is from the exterior of the tube inward, eating away at the copper, until penetration occurs and a leak results.

Carrier, Industry Research Report, Indoor Coil Corrosion, Nov. 2011 (available at http://www.conditionedairsolutions.com/wp-content/uploads/2012/04/01-811-20345-25.pdf ("Carrier Report").

122. The defective Rheem Coils render the Rheem ACs unfit for the ordinary purpose for which they are used because the loss of refrigerant reduces and/or eliminates the Rheem ACs' ability to provide cooled air.

123. The defective coils in the Rheem ACs caused Plaintiffs and the Classes to suffer

damages, including, but not limited to, the difference in value of the Rheem ACs as warranted and the Rheem ACs they received with defective Coils, loss of use of their Rheem ACs, labor costs, repair costs, and replacement refrigerant costs. The defective evaporator coils were the direct, proximate, and foreseeable cause of damages incurred by Plaintiffs and Class members.

124. Had the Rheem ACs been properly manufactured or free from design defects, Plaintiffs and the Classes would not have suffered the damages complained of herein.

125. That Rheem could have manufactured ACs free of this design defect and had knowledge of the defect is evidenced by Rheem's newly developed and marketed evaporator coils.

126. On or about September 2013, as part of an effort to halt leaking related problems with its Rheem Air Conditioners, Defendant introduced new coils made from aluminum, which Rheem describes on its website as follows:

- Rheem® Indoor Replacement Coils are designed for use with Rheem outdoor units and are available for vertical upflow or downflow, and horizontal left or horizontal right airflow. When matched with Rheem outdoor units, the coils provide a nominal capacity range from 18,000 BTU/HR [5.24 kW] to 60,000 BTU/HR [17.6 kW].

- Constructed of aluminum fins bonded to internally grooved aluminum tubing.

- Coils are tested at the factory with an extensive refrigerant leak check.

127. In a product video it issued in 2013, a Rheem product manager, while explaining the benefits of the new aluminum coils, admitted that "…obviously the biggest difference that aluminum affords us is the elimination of formicary corrosion." *See New Rheem Aluminum Uncased Replacement Coils*, Eric Bowman, Rheem Residential Cooling Product Manager (available at https://www.youtube.com/watch?v=R1vyknfWNLA).

## TOLLING AND ESTOPPEL OF STATUTES OF LIMITATION

128. Plaintiffs are within the applicable statute of limitations for the claims presented because Plaintiffs did not discover the defect, and could not reasonably have discovered the defect until approximately 2013. Further, Rheem and its agents affirmatively misrepresented the root cause of the problem by claiming that the ACs needed refills of refrigerant, rather than disclosing that the Coils were defective because they were made of copper and unreasonably susceptible to formicary corrosion, and that the Coils had failed due to formicary corrosion. Plaintiffs also assert that this action has been filed within all applicable time frames from the date of initial installation of the Air Conditioners.

129. Although Rheem was aware that Rheem Coils were defective, it took no steps to warn Plaintiffs and the Classes of the defect. Rather Rheem continued to sell its defective Coils to Plaintiffs and the Classes and continues to "fix" and replace failed Coils with similarly defective Coils.

130. The defects in the design or manufacture of the Rheem ACs were not detectible to Plaintiffs or members of the Classes and Subclasses until they manifested themselves when the defective evaporator coils cracked and caused the Rheem ACs to stop cooling.

131. Plaintiffs are also within the applicable statute of limitations because the Rheem warranty contained a promise of future performance. As such, a breach of warranty claim would only accrue upon Rheem's failure to fulfill its promised performance (*i.e.* failure to replace the defective coil with a non-defective coil).

132. Likewise, Plaintiffs claims are timely filed because Rheem contractually obligated itself to a warranted period of time greater than the statute of limitations. As this was a voluntarily provided contractual promise, Rheem cannot avoid claims that arose during the

warranty period by relying on the statute of limitations as an affirmative defense. If Rheem is allowed to sidestep its contractual warranty obligations by arguing the application of the statute of limitations, it would render the promised duration of the warranty illusory.

**THE PURPORTED WARRANTY LIMITATIONS ARE VOID AND INVALID**

133. Rheem provides the Rheem Warranty to purchasers of Rheem ACs subsequent to the time of purchase. A Rheem Warranty is attached as Exhibit E.

134. The Rheem Warranty purports to disclaim certain warranties and damages, stating,

> "ANY IMPLIED WARRANTIES, INCLUDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SHALL NOT EXTEND BEYOND THE APPLICABLE WARRANTY PERIODS SPECIFIED IN THIS LIMITED WARRANTY. THE MANUFACTURER'S SOLE LIABLITY WITH RESPECT TO DEFECTIVE PARTS OF FAILURE SHALL BE AS SET FORTH IN THIS LIMITED WARRANTY, AND ANY CLAIMS FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES ARE EPXRESSELY EXCLUDED"

Id.

135. Rheem also expressly purports to limit its warranty such that,

> "This Limited Warranty does NOT cover any labor costs or expenses for service. You are responsible for removing or reinstalling parts. You are responsible for all labor costs or expenses, unless a labor service agreement exists between you and your contractor."

Id.

136. The above warranty limitations are unenforceable because they are unconscionable.

137. The limitations are procedurally unconscionable because of the relative bargaining power of the parties and the fact that Plaintiffs lacked a meaningful choice on whether to accept the warranty limitations. Here, Plaintiffs had no ability to negotiate around or waive the provision of the warranty limitations and the terms were presented on a take-it-or-leave-it basis.

138. The warranty limitations are also procedurally unconscionable because Plaintiffs were not presented with a copy of the warranty prior to the installation of the AC units – at which point, the costs were already incurred and rejection of the warranty limitations by rescission of the contract would be objectively unreasonable.

139. The warranty limitations are substantively unconscionable because, as set forth above, Rheem had knowledge of the design defect (*i.e.* the high-incidence of formicary corrosion in copper evaporator coils) at the time each Plaintiff purchased their respective air conditioning units.

140. The above warranty limitations also fail their essential purpose because the Rheem ACs contained defective coils that were defective at the time Plaintiffs and members of the Classes acquired their Rheem ACs.

141. Here, Rheem had knowledge of the defect and adopted a standard practice of denying warranty coverage for the defective coils. Instead, Rheem required Plaintiffs to pay for the costs and labor for refrigerant refills and replacing defective coils with another defective coil.

142. It is only after multiple failures that Rheem would replace the defective coil with a non-defective coil. At this point, the Plaintiffs had incurred hundreds or thousands of dollars in out-of-pocket expenses for refrigerant and labor.

143. It was Rheem's knowledge of the inherent design defect in its coils that led Rheem to provide a warranty of limited duration (5-years), to exclude the costs of refrigerant and labor (which is a necessary expense each time the defect manifested), to attempt to exclude the implied warranty of merchantability (because an AC unit without refrigerant can perform its intended function of cooling air), and to adopt the uniform practice of having expensive refrigerant refills and replacement coils installed before ultimately providing a non-defective coil

(again, with labor and refrigerant costs to be borne by the Plaintiffs).

144. The above warranty limitations also fail of the essential purpose because no remedies offered by Rheem give purchasers of Rheem ACs the benefit of their bargain, *i.e.*, a merchantable air conditioner.

145. The limitation of damages is ineffective because the Rheem ACs are sold to consumers with Coils that are unreasonably susceptible to formicary corrosion, which none of Rheem's limited remedies sufficiently address. The Rheem Warranty fails in its essential purpose, and Plaintiffs and the Classes are entitled to a remedy under the Uniform Commercial Code.

146. The purported disclaimer of warranties is also ineffective because Rheem does not provide the Rheem Warranty to purchasers of Rheem ACs before or at the time of purchase. Consumers only learn of such purported disclaimers at the time of installation of their Rheem AC, and such limitations cannot be considered to be a part of the bargain.

**COUNT I**
**Express Warranty**
**(On Behalf of Plaintiffs, the Classes, and Subclasses)**

147. Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein.

148. Plaintiffs bring this claim on behalf of the Classes, or, in the alternative on behalf of the Subclasses.

149. Rheem expressly warranted via its user manuals, website, brochures, specifications, and/or models that the Rheem ACs are fit for the ordinary purpose in which such goods are used.

150. Rheem's express warranties were part of the basis of the bargain between Rheem

and Plaintiffs and members of the Classes.

151. Rheem breached its express warranties because the Rheem ACs were not fit for the ordinary purpose in which they are used and because they were not free from defects in materials and workmanship that affect performance under normal use and maintenance. Specifically, the Rheem ACs are defective because the Coils are unreasonably susceptible to formicary corrosion and failure, and thus improperly or prematurely crack and break under normal use, rendering them unfit for their ordinary purpose. Rheem also breached its express warranty by refusing to repair the Rheem ACs and/or by "fixing" failed Coils with similarly defective replacement Coils (*i.e.*, made of copper).

152. Plaintiffs and members of the Classes relied upon the representation or warranty that they would be supplied Rheem ACs and Coils, and/or replacement Coils, free of defects.

153. Plaintiffs and members of the Classes notified Rheem of the breach.

154. Plaintiffs and members of the Classes sustained injuries and damages as a result of the breach because (a) they paid a price premium due to the misrepresentations and omissions of material fact in the packaging, marketing, advertising on the Rheem ACs; (b) the Rheem ACs did not have the attributes or value promised; and/or (c) they paid out of pocket to replace a failed Coil, which was replaced with a similarly defective Rheem Coil.

155. The limitations on Rheem's express warranty are unconscionable or fail in their essential purpose.

156. Plaintiffs and members of the Classes are entitled to the full remedies provided under Article 2 of the Uniform Commercial Code as adopted by the proposed Class States, as well as all other applicable remedies.

**COUNT II**
**Implied Warranty of Merchantability**
**(On Behalf of Plaintiffs, the Classes, and Subclasses)**

157. Plaintiffs adopt and incorporate herein the allegations set forth in paragraphs 1 through 97 above.

158. Plaintiffs bring this claim on behalf of the Classes, or, in the alternative on behalf of the Subclasses.

159. Rheem is a merchant who sold air conditioning units to Plaintiffs and the Classes for residential use.

160. A warranty that goods shall be merchantable and fit for the ordinary purposes for which such goods are used is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

161. Rheem's implied warranty that the Rheem ACs were merchantable was part of the basis of the bargain between Rheem and Plaintiffs and members of the Classes.

162. Rheem breached the implied warranty of merchantability because the Rheem ACs were not of merchantable quality or fit for their ordinary and intended use and because they contained a defect at the time of their sale that resulted in, and continues to result in, leaking of refrigerant and failure of the product, when used in a normal, foreseeable, and customary way.

163. The defects at issue are latent defects. Plaintiffs and members of the Classes could not have known about their Rheem ACs' propensity for failure.

164. Plaintiffs and members of the Classes notified Rheem of the breach.

165. Plaintiffs and members of the Classes sustained injuries and damages as a result of the breach.

166. The exclusions and/or limitations on Rheem's implied warranties are

unconscionable and/or fail their essential purpose.

167. As a direct and proximate result of Rheem's breach of the implied warranty of merchantability, Plaintiffs and members of the Classes have suffered damages in amount to be determined at trial including direct monetary losses incurred by Plaintiffs and members of the Classes in connection with attempted repair of the Rheem ACs and/or the price premium paid for the Rheem ACs, or such further damage to be proven at trial.

168. Plaintiffs and members of the Classes are entitled to the full remedies provided under Article 2 of the Uniform Commercial Code as adopted by the proposed Class States, as well as all other applicable remedies.

**COUNT III**
**Implied Warranty of Fitness for a Particular Purpose**
**(On Behalf of Plaintiffs, the Classes, and Subclasses)**

169. Plaintiffs adopt and incorporate herein the allegations set forth in paragraphs 1 through 97 above.

170. Plaintiffs bring this claim on behalf of the Classes, or, in the alternative on behalf of the Subclasses.

171. Rheem sold and promoted the Rheem ACs, which it placed into the stream of commerce. Rheem knew or had reason to know of the specific use, *i.e.*, home cooling, for which the Rheem ACs were purchased, and it impliedly warranted that the Rheem ACs were fit for such use.

172. Plaintiffs and members of the Classes reasonably relied upon the expertise, skill, judgment, and knowledge of Rheem and upon its implied warranty that the Rheem ACs were fit for the purpose and use of cooling homes.

173. Through the conduct alleged herein, Rheem has breached the implied warranty of

fitness for a particular purpose. The defectively designed Rheem ACs were not fit for the particular purpose for which they were purchased by Plaintiffs and members of the Classes to perform. The Plaintiffs and the Classes purchased the Rheem ACs for a particular purpose of being able to cool their homes. Rheem knew that the Plaintiffs and members of the Classes were purchasing the Rheem ACs for this purpose and marketed the products for this particular purpose.

174. Plaintiffs and members of the Classes relied on Rheem's misrepresentations by purchasing the Rheem ACs.

175. Rheem knew or had reason to know that Plaintiffs and members of the Classes were influenced to purchase the Rheem ACs through Rheem's expertise, skill, judgment, and knowledge in furnishing the products for their intended use.

176. The Rheem ACs were not fit for their particular intended use because the design or manufacturing defects alleged herein render them incapable of properly providing cool air to Plaintiffs and Class members' homes as they contain defective evaporator Coils which are unreasonably susceptible to formicary corrosion, which causes them to crack and break under normal use.

177. Rheem's actions, as complained of herein, breached their implied warranty that the Rheem ACs were fit for such use, in violation of Uniform Commercial Code §2-315 as well as the common law and statutory laws of others states.

178. Moreover, the limitations on Rheem's implied warranties are unconscionable and/or fail their essential purpose.

179. Plaintiffs and members of the Classes have incurred damages as described herein as a direct result of the failure of Rheem to honor its implied warranty. In particular, Plaintiffs

and members of the Classes would not have purchased the Rheem ACs had they known the truth about the defects; nor would they have suffered the collateral effects and damages associated with these defects.

**COUNT IV**
**Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. §§ 501.201-501.23**
**(On behalf of Plaintiff Justice and Florida Subclasses)**

180. Plaintiff Justice adopts and incorporates herein the allegations set forth in paragraphs 1 through 97 above.

181. Plaintiff Justice asserts this claim individually and on behalf of the Florida Subclasses.

182. The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-501.23*et seq.*, ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce...." Fla. Stat. § 501.204(1) (2001).

183. Defendant's acts and practices, alleged herein, constitute unfair, deceptive, and/or fraudulent business practices in violation of the FDUTPA, including but not limited to, Defendant's misrepresentations and omissions in the sale of defective Rheem ACs.

184. Defendant intended for Plaintiff and members of the Subclasses to rely on its aforementioned deceptive acts and practices, and such deceptive acts and practices occurred in the course of conduct involving trade or commerce.

185. Plaintiff Justice and members of the Florida Subclasses were exposed to such omissions and misrepresentations and were deceived.

186. Defendant's violation of the FDUTPA caused Plaintiff Justice and members of

the Florida Subclasses to sustain substantial and ascertainable losses of money and/or property and other damages because they were induced to purchase or paid a price premium due to the false and misleading advertising and marketing of Rheem ACs and/or Defendant's failure to disclose the defects of said products, and/or paid to replace defective Coils.

187. Plaintiff Justice's and members of the Florida Subclasses' Rheem AC's are of significantly diminished value because the Rheem AC's do not perform their sole function without the need for costly repair.

**COUNT V**
**Alabama Deceptive Trade Practices Act,**
**Ala.Code 1975 § 8-19-1**
**(On behalf of Plaintiff Hatfield and Alabama Subclasses)**

188. Plaintiff Hatfield adopts and incorporates herein the allegations set forth in paragraphs 1 through 97 above.

189. Plaintiff Hatfield asserts this claim individually and on behalf of members of the Alabama Subclasses.

190. The Alabama Deceptive Trade Practices Act, prohibits, inter alia "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another[,]" and "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce" Ala. Code § 8-19-5.

191. Defendant's acts and practices, alleged herein, constitute false, misleading, and/or deceptive business practices in violation of the Alabama Deceptive Trade Practices Act, including but not limited to, Defendant's misrepresentations and omissions in the sale of defective Rheem ACs.

192. Defendant intended for Plaintiff and members of the Alabama Subclasses to rely on its aforementioned deceptive acts and practices, and such deceptive acts and practices occurred in the course of conduct involving trade or commerce.

193. Plaintiff Hatfield and members of the Alabama Subclasses were exposed to such omissions and misrepresentations and were deceived.

194. Defendant's violation of the Alabama Deceptive Trade Practices Act caused Plaintiff Hatfield and members of the Alabama Subclasses to sustain substantial and ascertainable losses of money and/or property and other damages because they were induced to purchase or paid a price premium due to the false and misleading advertising and marketing of Rheem ACs and/or Defendant's failure to disclose the defects of said products, and/or paid to replace defective Coils.

195. Plaintiff Hatfield's and members of the Alabama Subclasses' Rheem AC's are of significantly diminished value because the Rheem AC's do not perform their sole function without the need for costly repair.

**<u>COUNT VI</u>**
**South Carolina Unfair Trade Practices Act,**
**S.C. Code Ann. § 39-5-20 *et seq.***
**(On behalf of Plaintiff Finn and South Carolina Subclasses)**

196. Plaintiff Finn adopts and incorporates herein the allegations set forth in paragraphs 1 through 97 above.

197. Plaintiff Finn asserts this claim individually and on behalf of members of the South Carolina Subclasses.

198. The South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-20 *et seq.* prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C.Code Ann. § 39–5–20.

199. Throughout the Class Period, Defendant conducted "trade" and "commerce" within the meaning of S.C.Code Ann. § 39–5–20 by its advertising, offering for sale, and sale of Rheem ACs.

200. Defendant's acts and practices, alleged herein, constitute unfair, deceptive, and/or fraudulent business practices in violation of the South Carolina Unfair Trade Practices Act, including but not limited to, Defendant's sale of defective Rheem ACs.

201. Defendant's unfair and deceptive acts and practices, alleged herein, have adversely affected the public interest.

202. Defendant intended for Plaintiff Finn and members of the South Carolina Subclasses to rely on its aforementioned deceptive acts and practices, and such deceptive acts and practices occurred in the course of conduct involving trade or commerce.

203. Plaintiff Finn and members of the South Carolina Subclasses were exposed to such misrepresentations and were deceived.

204. Defendant's violation of the South Carolina Unfair Trade Practices Act caused Plaintiff Finn and members of the South Carolina Subclasses to sustain substantial and ascertainable losses of money and/or property and other damages because they were induced to purchase or paid a price premium due to the false and misleading advertising and marketing of Rheem ACs and/or Defendant's failure to disclose the defects of said products, and/or paid to replace defective Coils.

205. Plaintiff Finn's and members of the South Carolina Subclasses' purchases are of significantly diminished value because the Rheem AC's do not perform their sole function without the need for costly repair.

**<u>COUNT VII</u>**
**Georgia Fair Business Practices Act**
**Ga. Code Ann., § 10-1-391 *et seq.***
**(On behalf of Plaintiff Dotson and Georgia Subclasses)**

206. Plaintiff Dotson adopts and incorporates herein the allegations set forth in paragraphs 1 through 97 above.

207. Plaintiff Dotson asserts this claim individually and on behalf of members of the Georgia Subclasses.

208. The Georgia Fair Business Practices Act, Ga. Code Ann., § 10-1-391 *et seq. et seq.* prohibits forbids and declares unlawful any unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce.

209. Defendant's acts and practices, alleged herein, constitute unfair, deceptive, and/or fraudulent business practices in violation of the Georgia Fair Business Practices Act, including but not limited to, Defendant's sale of defective Rheem ACs.

210. Defendant's unfair and deceptive acts and practices, alleged herein, have adversely affected the public interest.

211. Defendant intended for Plaintiff Dotson and members of the Georgia Subclasses to rely on its aforementioned deceptive acts and practices, and such deceptive acts and practices occurred in the course of conduct involving trade or commerce.

212. Plaintiff Dotson and members of the Georgia Subclasses were exposed to such misrepresentations and were deceived.

213. Defendant's violation of the Georgia Fair Business Practices Act caused Plaintiff Dotson and members of the Georgia Subclasses to sustain substantial and ascertainable losses of money and/or property and other damages because they were induced to purchase or paid a price premium due to the false and misleading advertising and marketing of Rheem ACs and/or Defendant's failure to disclose the defects of said products, and/or paid to replace defective Coils.

214. Plaintiff Dotson's and members of the Georgia Subclasses' purchases are of significantly diminished value because the Rheem AC's do not perform their sole function without the need for costly repair.

**COUNT VIII**
**Unjust Enrichment**
**(On Behalf of Plaintiffs, the Classes, and Subclasses)**

215. Plaintiffs adopt and incorporate herein the allegations set forth in paragraphs 1 through 97 above.

216. Plaintiffs bring this claim on behalf of the Classes, or, in the alternative on behalf of the Subclasses.

217. Plaintiffs and members of the Classes conferred a benefit upon Rheem. Namely, Plaintiffs and Class members paid money for ownership of their Rheem ACs.

218. Rheem retained that benefit.

219. Rheem retained that benefit under circumstances that make it inequitable for Rheem to retain it without paying the value thereof. Specifically, Rheem retained that benefit despite the fact that the Rheem ACs contained defective Coils.

220. Plaintiffs purchased the Rheem ACs from a Rheem agent, in part, because of Rheem's advertisements, marketing, and product claims, and a result, a relationship between the

parties has been created even though Plaintiffs did not purchase Rheem ACs directly from Rheem.

221. As set forth above, Rheem misrepresented the relevant Rheem ACs as free from design defect through it marketing, advertising, product packaging, and print publications specifically designed to entice Plaintiffs, Class Members, builders, contractor, and others to buy Rheem ACs.

222. Because Rheem's retention of the non-gratuitous benefit conferred on it by Plaintiffs and Class members is unjust and inequitable, Rheem must pay restitution to Plaintiffs and Class members for its unjust enrichment, as ordered by the Court.

**COUNT IX**
**Declaratory Relief, 28 U.S.C. § 2201**
**(On Behalf of Plaintiffs, the Classes, and Subclasses)**

223. Plaintiffs adopt and incorporate herein the allegations set forth in paragraphs 1 through 97 above.

224. Plaintiffs brings this claim on behalf of the Classes, or, in the alternative on behalf of the Subclasses pursuant to 28 U.S.C. § 2201.

225. There is an actual controversy between Plaintiffs and the Classes on one hand, and Rheem on the other regarding the marketing and sale of the Rheem ACs.

226. Pursuant to 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

227. Rheem marketed and sold, and continues to market and sell, Rheem ACs with defective Coils, while concealing this defect from consumers.

228. Rheem has acted or refused to act on grounds that apply generally to the

Declaratory Relief Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole within the meaning of Fed. R. Civ. P. 23(b)(2). Plaintiffs seeks declaratory relief, ruling that:

a. Rheem ACs containing copper Coils are defective because they are unreasonably susceptible to formicary corrosion;

b. Certain provisions and limitations of Rheem's warranty are void as unconscionable and/or because they fail of their essential purpose;

c. Rheem must notify AC owners of the defect;

d. The durational limitations on the warranty are removed;

e. Rheem will reassess all prior warranty claims and pay the full cost of repairs and damages;

f. Rheem will replace, at its own cost, any Class Member's Rheem Coil with a non-copper coil;

g. Rheem will pay the cost of inspection to determine whether any Class Member's Rheem Coils need replacement; and

h. Any limitation of damages or disclaimer or warranty by Rheem with regard to Rheem Coils are void.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and others similarly situated, seek judgment against Defendant as follows:

A. For an order certifying the Class and/or Subclasses and/or issue Class(es) under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class Representative and their attorneys as Class Counsel to represent the Class and Subclass members;

B. For an order finding in favor of the Plaintiffs and the Class(es) on all counts asserted herein;

C. For an order awarding damages in an amount to be determined by the Court or jury;

D. For prejudgment interest on all amounts awarded;

E. For an order of restitution and all other forms of injunctive and/or equitable relief;

F. For an order awarding Plaintiffs and Class(es) reasonable attorneys' fees and expenses and costs of suit; and

G. For an order awarding Plaintiffs and Class(es) their reasonable attorneys' fees, and

H. For all further relief, as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated: September 18, 2014.

Respectfully submitted,

s/Theodore J. Leopold
Theodore J. Leopold (Florida Bar No.: 705608)
Email: tleopold@cohenmilstein.com
Leslie M. Kroeger (Florida Bar No.: 989762)
Email: lkroeger@cohenmilstein.com
**Cohen Milstein Sellers & Toll, PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (561) 515-1400
Facsimile: (561) 515-1401

Andrew N. Friedman
Afriedman@cohenmilstein.com
Douglas J. McNamara
Dmcnamara@cohenmilstein.com
**Cohen Milstein Sellers & Toll, PLLC**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Jeffrey A. Leon
Jeff@Qulegal.com
Jamie E. Weiss
Jamie@Qulegal.com
Zachary Jacobs
Zachary@Qulegal.com
**QUANTUM LEAGAL LLC**
513 Central Ave., Suite 300
Highland Park, Illinois 60035
Phone: (847) 433-4500

Jonathan Shub
JShub@seegerweiss.com

**SEEGER WEISS LLP**
1515 Market St., Suite 1380'
Philadelphia, PA 19102
Phone: (215) 564-2300

Richard J. Burke
Rich@Qulegal.com
**QUANTUM LEGAL LLC**
1010 Market Street, Suite 1340
St. Louis, MO 63101
Attorneys for Plaintiffs and Proposed Classes

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Second Amended Class Action was served via the CM/ECF system on all counsel of record on September 18, 2014.

Adam M. Foslid, Esq.
foslida@gtlam.com
David A. Coulson, Esq.
coulsond@gtlaw.com
Greenberg Traurig
333 Avenue of the Americas
Suite 4400
Miami, FL 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
Attorneys for Rheem Manufacturing Company

**Cohen Milstein Sellers & Toll, PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (561) 515-1400
Facsimile: (561) 515-1401

s/Theodore J. Leopold
Theodore J. Leopold (Florida Bar No.: 705608)
Email: tleopold@cohenmilstein.com
Leslie M. Kroeger (Florida Bar No.: 989762)
Email: lkroeger@cohenmilstein.com